USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:

ALMA WIGGINS,

              Plaintiff,               06 Civ. 1946 (THK)

      -against-

                             **MEMORANDUM OPINION AND**
                             **ORDER**
NEW YORK CITY DEPARTMENT OF
CORRECTION, et al.,

              Defendants.
------------------------------------X

**THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

Plaintiff, Alma Wiggins, a former correction officer employed by the New York City Department of Correction ("DOC"), brings this action under 42 U.S.C. §§ 1983 ("Section 1983"), 1985, and 1988, as well as under the New York State Executive Law § 290 et. seq., and the New York City Human Rights Law, New York City Administrative Code Title 8. In a series of orders, the District Court (Kaplan, D.J.) dismissed all of Plaintiff's federal claims, except for Plaintiff's Section 1983 claim alleging that she was denied equal protection under the Fourteenth Amendment, by the City of New York ("the City"), because she had a disabling knee injury. (See Order of the Hon. Lewis A. Kaplan, dated October 11, 2006 (granting Defendants' motion to dismiss Plaintiff's challenge to the DOC sick leave policy, her retaliation, Section 1985(3), and emotional distress claims, and her claim against DOC as a party to the suit); Order of the Hon. Lewis A. Kaplan, dated May 9, 2007 (granting Defendants' motion to dismiss all claims against Ms. Codrington, a

DOC employee, and all claims against the City, except Plaintiff's equal protection claims brought pursuant to Section 1983).)

The parties have consented to proceed before this Court, pursuant to 28 U.S.C. § 636(c). Presently before the Court is Defendant City of New York's Motion for Summary Judgment, brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court grants Defendant's motion and dismisses this action with prejudice.

## BACKGROUND

This action arises out of Plaintiff's employment as a DOC correction officer. The following facts, as alleged by Plaintiff, are generally not challenged by Defendant, and are assumed to be true for purposes of the instant motion.

### 1. The Initial Injury: February 11, 2003

Plaintiff commenced her employment with DOC in 1996. (See Compl. ¶ 10.) Among her responsibilities were the care, custody and control of prisoners. (See Deposition of Alma Wiggins, dated Oct. 29, 2007 ("Wiggins Dep."), at 37.)

On February 11, 2003, while at work, Plaintiff hit her left knee on a metal post. (See id. at 47.) Plaintiff notified her superiors and her area supervisor, Captain Richard Polek. (See id. at 28, 47.) Another officer relieved Plaintiff of her post two hours later, and she went to see medical staff at Health and Hospitals Corporation Correctional Health Services. According to

2

Plaintiff, she submitted an injury report to Polek, her area supervisor. Plaintiff claims that she had to advise Polek of the procedures for submission of an injury report, because he was new to his position. (See id. at 52-53.) Apparently, the submission of an injury report is a prerequisite for filing a workers' compensation claim.

Wiggins returned to work with knee discomfort later that week. (See id. at 55.) She did not hear anything about her injury report or workers' compensation claim. Sometime in March 2003, she decided to call workers' compensation for her claim number; she alleges that she was told that it did not exist. (See id. at 29) Instead, workers' compensation directed Plaintiff to contact her command officer, Officer Zigler, who, according to Plaintiff, told her that there was no record of the accident. (See id. at 29-30.) According to Plaintiff, Officer Zigler told her that the lost claim number was her fault because she was responsible for following-up. (See id. at 30.) Plaintiff next called her union to inquire about DOC protocol. (See id.) Plaintiff claims the union representative told her that she was not responsible for follow-up.

Plaintiff alleges that she attended a workers' compensation meeting regarding DOC's refusal to open a claim for her knee injury. Sometime during the meeting, Plaintiff spoke with her area supervisor, Captain Polek. (See id. at 95.) According to Plaintiff, Polek told her "the records [of her initial injury] were

3

destroyed and thrown in the garbage." (Id.) Polek did not tell Plaintiff why the records were destroyed, or by whom. (See id.)

## 2. Knee Pain in 2004 and the Ensuing Medical Documentation

About eighteen months after her initial knee injury, on July 26, 2004, Plaintiff claims that the pain in her knee intensified overnight. (See id. at 56-57.) Plaintiff went to the emergency room at Beth Israel Hospital. (See id.) The doctors there took x-rays, but due to swelling could not determine the cause of the pain and suggested that Plaintiff see her primary care physician to get a referral for an orthopedic surgeon. (See id.)

Shortly thereafter, Plaintiff's personal physician referred her to an orthopedic surgeon, Dr. Paul Ackerman, who, according to Plaintiff, examined her knee and told her she needed knee replacement surgery. (See id. at 59-60.) Plaintiff's medical records indicate that, in early August, Dr. Ackerman determined that Plaintiff could not return to work because she had severe "DJD" (degenerative joint disease) in her knee. (Exhibit ("Ex.") C annexed to Declaration of Rosa Lugo, dated Dec. 13, 2007 ("Lugo Decl."), copy of Plaintiff's medical documentation form, dated August 6, 2004.)[1]

---

[1] Pursuant to DOC sick leave policy, Plaintiff's personal physician submitted a form to DOC each time Plaintiff had a medical appointment relating to her reason for being on sick leave. (See Ex. A annexed to Lugo Decl., copy of Directive 2262R, Sick Leave Regulations for Members of the Uniformed Force ("Directive 2262R").)

4

While difficult to read in their entirety, the medical records dating from September 2004 to February 2005, indicate that, at first, Dr. Ackerman prescribed physical therapy. (See Ex. D annexed to Lugo Decl.) By the end of October, Dr. Ackerman's notes indicate that Plaintiff "may require arthroscopic surgery" on her knee. (Id.) By the end of November, Dr. Ackerman advised arthroscopic surgery and scheduled it for January 2005. (See id.) On January 19, 2005, Dr. Ackerman submitted a form to DOC that indicated that Plaintiff was unable to return to work because she was tentatively scheduled for arthroscopic surgery on February 3, 2005. (See id.) Plaintiff had arthroscopic surgery in late February 2005. (See id.) From March to mid-June 2005, Dr. Ackerman suggested post-surgical physical therapy. (See Ex. E annexed to Lugo Decl.) On June 22, 2005, Dr. Ackerman prescribed total knee replacement surgery due to the progression of the degenerative joint disease. (See id.) On August 10, 2005, Dr. Ackerman wrote that surgery was pending for August 29, 2005, assuming workers' compensation approval. (See Ex. H annexed to Lugo Decl.)

At no time after her initial knee injury did Plaintiff fill out and submit a Reasonable Accommodation Request Form, required by DOC policy if an employee seeks an on-the-job accommodation for a physical or medical condition. (See Pl.'s Dep., at 110.)

## 3. Plaintiff's Interactions with the Health Management Division

5

During the time Plaintiff was seeing the orthopedic surgeon, she also reported to DOC's Health Management Division ("HMD"). (See Pl.'s Dep., at 56.) DOC has specific guidelines for how to report the need for sick leave and what is required while on authorized sick leave. (See Directive 2262R.) According to DOC regulations, once an employee is on sick leave for more than thirty days, she is deemed to be on indefinite sick leave status and must regularly visit HMD so that DOC can monitor the employee's medical status. (See id. at 3, III(A)(6).) The employee's personal doctor must submit documentation to HMD for every medical visit relating to the member's inability to perform full duty. (See id. at 9, III(G)(2).) The documentation must inform HMD of the employee's medical condition and when the doctor expects the employee to be able to return to full duty. (See id.) All workers' compensation cases must be reported to HMD (see id. at 19, III(A)(1)(b)), and workers' compensation ultimately has to authorize employee surgery. (See Wiggins Dep., at 27, 69.)

Beginning in August 2004, Plaintiff reported to HMD doctors in conjunction with her scheduled visits to her orthopedic surgeon. (See Wiggins Dep., at 61.) Plaintiff first saw an HMD doctor named Dr. Cessnock. (See id.) Plaintiff later saw another HMD doctor, Dr. Doca. Plaintiff claims that at her first appointment with Dr. Doca, in late August, she gave him Dr. Ackerman's medical file, which included all of her medical reports, x-rays, and an MRI. (See

6

id. at 64, 66.) According to Plaintiff, Dr. Doca then scheduled her to return with another form from her orthopedic surgeon, and an update on her condition. (See id.)

Plaintiff claims her problems with Dr. Doca started after this first appointment, in late August. "He started to constantly harass me. He was saying that I wasn't bringing in my reports, he felt that I was faking my injury, I was making it up, that he had officers that had the same condition that I had and they are already back to work. He doesn't understand why I can't make it back to work. He don't see no problem with it." (Id.) When Plaintiff returned for her second appointment, on August 30, 2004, Plaintiff claims Dr. Doca told her that the MRI report was not in her file, even though Plaintiff contends she previously submitted it to him. (See id. at 68.) Plaintiff also claims that her doctor constantly was faxing the latest reports to the HMD office. (See id.)

Plaintiff next returned to see Dr. Doca on September 15, 2004. (See id.) According to Plaintiff, Dr. Doca told her: "In my opinion, nothing is wrong with you. You are faking this whole thing, so I am sending you back to work." (Id.) Plaintiff told him that he had her files in front of him, and questioned how he could claim she was faking her injury. (See id.) During the same conversation, Plaintiff claims that Dr. Doca threatened to medically separate her from DOC if she did not return to work the

7

next day. (See id. at 71.) Dr. Doca started talking loudly and yelling. (See id. at 69.) According to Plaintiff, both a DOC captain and a security officer ran into the room and asked if everything was okay. (See id. at 70.) Plaintiff told the officers, "no, he is harassing me. He is telling me I am faking my injury; I am making it up and he is sending me back to work tomorrow. I can't go back to work. I can't even travel." (Id.) Because of this exchange, Plaintiff requested that HMD reassign her to a new doctor to oversee her sick leave medical documentation. (See id. at 72.) A transfer was approved. (See id.)

Plaintiff was then assigned to Dr. Bazzuo and scheduled an appointment to see him on November 22, 2004. (See id.) Plaintiff also called her union for assistance, but she alleges she was told "they could not [assist her], as she probably would be medically separated from her employment." (Id. at 109.) When Plaintiff arrived for her November 22 appointment with Dr. Bazzuo, she claims an HMD office employee told her no appointment was on the schedule. (See id. at 75.) Plaintiff contends that she did have an appointment with Dr. Bazzuo, and while she was arguing with the HMD office employee, Dr. Cessnock offered to see Plaintiff. (See id.) Plaintiff alleges that Dr. Cessnock told her that she did have an appointment and that all of her medical documentation was in her file. (See id. at 76-77, 109.)

HMD called Plaintiff sometime in January 2005 to notify her

8

that she was considered "AWOL" for not appearing for her doctor's appointment. (See id. at 98.) Plaintiff admits that she did not return to HMD after the November appointment, until she contacted HMD in February 2005, after her arthroscopic surgery. (See id. at 26, 77.) Plaintiff contends that, at this follow-up appointment, an HMD doctor did not look at her knee or post-operative medical reports. (See id. at 27.)

According to Plaintiff, sometime in early 2005, before Plaintiff underwent her first knee surgery, one of her orthopedic doctors, Dr. Winiarsky, asked her why there was a delay in scheduling her arthroscopic surgery. (See id. at 24-25.) Plaintiff told him it was because of the delayed paperwork. (See id. at 25.) Plaintiff claims that her doctor told her that because she had waited so long to have the surgery, increased inflammation and swelling in the knee might diminish the efficacy of the surgery. (See id.) After the arthroscopic surgery, Plaintiff claims that Dr. Winiarsky told her the surgery was not successful because her knee had been inflamed for too long. (See id. at 24-25.)

## 4. Plaintiff's Interactions with CARE

After her problems with HMD and the lack of assistance from her union, on February 3, 2005, Plaintiff decided to contact CARE, a unit at DOC designed to support and aid correction officers who feel as if they are being "stressed" or harassed, and who think they might be suicidal. (See id. at 97.)

9

I called them because I was really just tired of the constant harassment, scheduling to make appointments back and forth with my injury to my knee, AWOLing, it was a whole lot of things, just being harassed every time I go there. I had enough. I reached the point I had enough. So I figured maybe now let me try this alternative. This has to help me. I think I made the worst choice when I called them.

(Id. at 103.)

After relating her problem to CARE over the telephone, Plaintiff claims she was told to come to the office if she wanted help. Plaintiff stated that she could not travel due to her knee pain, and asked if someone could come to her home. (See id. at 98.) A representative from CARE told her that they would not send someone out to her home simply because she had a knee injury. (See id.) Nevertheless, later that day, Ms. Castro, who said she was from CARE, showed up at Plaintiff's home and Plaintiff invited her in. Soon thereafter, another CARE representative, Captain Codrington, arrived. (See id. at 99.)

Police officers from the 69th Precinct then showed up, claiming that Plaintiff had called the police, stating that she was suicidal. Plaintiff told them she did not call. (See id. at 100.) The Duty Captain arrived, to whom Plaintiff explained the situation. The two CARE representatives took the Duty Captain outside to speak, after which the Duty Captain informed Plaintiff that they were taking her to a mental institution to be evaluated, even if they had to do so by force. Plaintiff was handcuffed and

10

carried out to an ambulance in front of her neighbors. (See id. at 102.)

Plaintiff was taken to a hospital for evaluation, where she says she explained to the staff that she had neither called 911 nor posed a danger to anyone. A doctor examined her, ran tests, and interviewed the police officers. Plaintiff claims the doctor released her after commenting that this was "becoming a joke." (Id. at 102-03.)

## 5. Medical Separation

Under Civil Service Law § 71, DOC may medically separate an employee who does not return to work within one year of being out on indefinite sick leave resulting from an occupational injury. An employee can seek reinstatement within one year of being medically separated, if she submits documentation from her personal physician indicating that she is fit to return to duty. (See Ex. F annexed to the Lugo Decl., Letter from Assistant Commissioner Robert O'Leary to Plaintiff, and accompanying Certificate of Service, dated June 15, 2005.)

On June 15, 2005, DOC informed Plaintiff that she would be medically separated, on July 15, 2005, unless she submitted specific documentation demonstrating that she was able to perform the full duties of her position. (See id.) On July 15, 2005, Plaintiff's doctor informed DOC that Plaintiff would not be able to return to full duty because she was scheduled to undergo knee

11

surgery. (See Ex. G annexed to Lugo Decl.) Again, on August 10, 2005, Plaintiff's doctor informed DOC that Plaintiff was unable to return to full duty because she was still waiting to undergo knee surgery. (See id.)

Plaintiff was placed on disability retirement on August 15, 2005. (See Ex. I annexed to the Lugo Decl., Letter from Assistant Commissioner Alan Vengersky to Plaintiff, dated Aug. 11, 2005.) Plaintiff had partial knee replacement surgery on May 25, 2006, and then another procedure to replace the knee on November 1, 2006.

Plaintiff claims that DOC's actions and policies violated her right to equal protection under the law by treating her differently that other correction officers because of her knee injury. Defendant argues that it is entitled to summary judgment because it does not have a custom, policy, or practice of discriminating against individuals with knee injuries, and that Plaintiff cannot show that she was placed on disability retirement as a result of an irrational or arbitrary decision motivated by discriminatory animus.

## DISCUSSION

### I.  Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary judgment may not be granted unless the Court determines that there is no genuine issue of material fact to be tried, and that the facts as to which there is no such issue

12

warrant judgment for the moving party as a matter of law.  See
Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548,
2552-53 (1986); Salahuddin v. Goord, 467 F.3d 263, 272-73 (2d Cir.
2006); Williams v. Utica College of Syracuse Univ., 453 F.3d 112,
116 (2d Cir. 2006).  The burden of demonstrating the absence of any
genuine dispute as to material facts rests upon the party seeking
summary judgment.  See Adickes v. S.H. Kress & Co., 398 U.S. 144,
157, 90 S. Ct. 1598, 1608 (1970).  Once a properly supported motion
for summary judgment is made, the burden shifts to the non-moving
party to make a sufficient showing to establish the essential
elements of that party's case on which it bears the burden of proof
at trial.  See Hayut v. State Univ. of N.Y., 352 F.3d 733, 743 (2d
Cir. 2003).  In assessing the record to determine whether there is
a genuine issue to be tried as to any material fact, courts are
required to resolve all ambiguities and draw all permissible
factual inferences in favor of the party against whom summary
judgment is sought.  See Anderson v. Liberty Lobby, Inc., 477 U.S.
242, 255, 106 S. Ct. 2505, 2513 (1986); Patterson v. County of
Oneida, 375 F.3d 206, 219 (2d Cir. 2004).  Nevertheless, to defeat
a summary judgment motion, the non-moving party must do "more than
simply show that there is some metaphysical doubt as to the
material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio
Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).  The non-
moving party must put forth "specific facts showing there is a

13

genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party may not rely on its pleadings, mere allegations, simple denials, conclusory statements, or conjecture to create a genuine issue for trial. See Anderson v. Liberty Lobby, 477 U.S. 242, 256-7, 106 S. Ct. 2505, 2514 (1986); Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007).

## II. Equal Protection Violation Claim Under 42 U.S.C. § 1983

Plaintiff claims that actions taken by various DOC employees deprived her of her right to equal protection under the Fourteenth Amendment. Specifically, she alleges that she was intentionally treated differently than other employees at DOC because of her knee injury. (See Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp."), at 5-6.) Plaintiff contends that: 1) she was harassed at work regarding her knee injury, which included having her medical paperwork delayed unnecessarily by DOC employees, so that she could not receive timely medical treatment, and thus was not fit to return to duty after one year on medical leave; and 2) she was not provided with any accommodations for her knee injury, with respect to her post or assignment, and then she was medically separated and prevented from returning to work by being placed on disability retirement against her will. (See id.)[2]

---

[2] Plaintiff also contends that she was involuntarily taken into custody by the police and subjected to a mental fitness examination at the behest of employees at CARE, a mental health

14

Plaintiff offers two theories under which her equal protection rights were violated. (See Pl.'s Opp., at 5-6.) First, Plaintiff claims she was singled out because of her knee injury, and intentionally treated differently than others similarly situated, without a rational basis for such treatment. (See id. at 6-7.) Second, Plaintiff claims Defendant purposefully discriminates against an identifiable class of employees with knee injuries, and that as a member of that class she also suffered discriminatory treatment. (See id. at 5-6.)

A.    Discrimination Based On A "Class-of-One"

Plaintiff first claims she was singled out because of her knee injury, and intentionally treated differently than others similarly situated, without any rational basis for such treatment - thus asserting what is commonly referred to as a "class-of-one" equal protection claim. See Village of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S. Ct. 1073 (2000). However, the Supreme Court recently held that a "class-of-one" equal protection claim "has no place in the public employment context." Engquist v. Oregon Dep't of Agriculture, __ U.S. __, 128 S. Ct. 2146, 2148-49 (2008). The Court reasoned that extending the "class-of-one" theory to the public employment context would lead to undue judicial interference

---

unit at DOC.  These allegations were dismissed by Judge Kaplan because they do not amount to an equal protection violation and, "at best . . . [constitute] rudeness, which is not actionable." See Order, dated May 9. 2007, at 2.

15

in state employment practices and would "constitutionalize the employee grievance." Id. at 2157 (quoting Connick v. Myers, 461 U.S. 138, 154, 103 S. Ct. 1684 (1983)). As the Court stated: "We have never found the Equal Protection Clause implicated in the specific circumstances where, as here, government employers are alleged to have made an individualized, subjective personnel decision in a seemingly arbitrary or irrational manner." Id. at 2155 (quoting Waters v. Churchill, 511 U.S. 661, 679 (1994) (plurality opinion)). A public employer's personnel decisions, including the decision to terminate an employee, is "an act of legislative grace, not constitutional mandate." Id. at 2156.

Plaintiff was a public employee who claims that she was denied equal protection of the laws because her rights as a DOC employee were infringed by a series of arbitrary actions by various other DOC employees, and by the arbitrary application of the City's sick leave policy. Her class-of-one equal protection claim is therefore barred by the Supreme Court's decision in Engquist. See Appel v. Spiridon, 531 F.3d 138, 141 (2d Cir. 2008) (per curiam) ("Recently, the Supreme Court held that the Equal Protection Clause does not apply to a public employee asserting a violation of the Clause under a 'class of one theory'.").

B. Discrimination Based On An Identifiable Class

Plaintiff appears to contend that she is a member of a group of disabled DOC employees with knee injuries, who are discriminated

16

against by DOC's policies and practices. (See Pl.'s Counter-Statement Pursuant to Local Rule 56.1 ("Pl.'s Rule 56.1 Stmt."), ¶ 2 ("Plaintiff does not dispute that she alleges she was denied a reasonable accommodation by DOC and placed on disability because the DOC has a custom, policy or practice of discriminating against individuals with knee injuries in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.").)³

The Fourteenth Amendment right to equal protection of the law "directs state actors to treat similarly situated people alike." Giano v. Senkowski, 54 F. 3d 1050, 1057 (2d Cir. 1995)(citing City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S. Ct. 3249, 3254 (1985)). To establish an equal protection violation, a plaintiff must "show[] that the defendant consciously applied a different standard . . . to similarly-situated individuals." Skehan v. Village of Mamaroneck, 465 F.3d 96, 111 (2d Cir. 2006) (citing LaTrieste Rest. & Cabaret, Inc. v. Vill. of Port Chester, 188 F.3d 65, 70 (2d Cir. 1999)). There is a two-step analytical process in assessing equal protection claims. See Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005).

---

³ Plaintiff's definition of the group she claims Defendant discriminates against is somewhat elusive. In her Memorandum of Law submitted in opposition to Defendant's motion, Plaintiff alleges purposeful discrimination against all disabled employees, rather than just employees with knee injuries. (See Pl.'s Mem. at 6.)

First, a plaintiff must "demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." Phillips, 408 F.3d at 129; accord Magilton v. Tocco, 379 F. Supp. 2d 495, 508 (S.D.N.Y. 2005) (finding that plaintiff, a public employee, could only sustain an equal protection claim if he provided the court with evidence demonstrating that individuals who were similarly situated to him in every material way were purposefully treated differently than he was). This requires proof "that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Personnel Adm'r v. Feeny, 442 U.S. 256, 279, 99 S. Ct. 2282, 2296 (1979).

Next, a plaintiff must show that "the disparity in treatment cannot survive the appropriate level of scrutiny." Phillips, 408 F.3d at 129. The Equal Protection Clause permits distinctions which are based on a person's disability, if they are rational and serve a legitimate end. See Garcia v. State Univ. of N.Y. Health Scis. Ctr., 280 F.3d 98, 109 (2d Cir. 2001) ("Where disability discrimination is at issue, the Fourteenth Amendment only proscribes government conduct for which there is no rational relationship between the disparity of treatment and some legitimate governmental purpose."). Where rational basis scrutiny applies, the government "has no obligation to produce evidence," or

18

"'empirical data'" to "sustain the rationality of a statutory classification." Heller v. Doe, 509 U.S. 312, 320, 113 S. Ct. 2637, 2643 (1993) (quoting FCC v. Beach Communications, Inc., 508 U.S. 307, 315, 113 S. Ct. 2096 (1993)).

In support of her equal protection claim, Plaintiff identifies three DOC employees, each with some kind of physical limitation or ailment, who she alleges were treated differently than other correction officers. (See Pl.'s Dep., at 88.) Plaintiff points to two employees with knee injuries and claims they were forced to return to work without reasonable accommodations for their physical limitations, under the threat of medical separation. According to Plaintiff, one of these DOC officers, "Thomas," had two knee surgeries and was still in "excruciating pain" when she returned to work, without any accommodation, in order to keep her pension. (See id. at 123-24.) The other DOC officer, "Harris," allegedly suffered a knee injury, had arthroscopic surgery, and then was threatened with medical separation unless she returned to full duty. (See id. at 120.) Plaintiff contends that Harris is currently on full duty. (See id.)

Plaintiff also references a third correction officer, with chronic asthma, who she claims was medically terminated after DOC refused to accommodate her, despite medical documentation that her asthma was severe. (See id. at 89.) Plaintiff claims this officer

19

was terminated because DOC refused to place her in an area with no inmate contact. (See id. at 89, 124.)

This is the sole evidence Plaintiff has offered in support of her contention that correction officers with knee injuries are discriminated against because they are not offered accommodations on the job, and then are medically separated from service. The evidence is woefully inadequate to demonstrate an equal protection violation.

As an initial matter, there is no competent evidence regarding the alleged discriminatory treatment of the other knee-injured individuals. With regard to Officer Harris, Plaintiff concedes that she was back at full duty work, and she does not know whether her physician indicated that she could resume her full duty responsibilities. Nor does she know how long Harris was out of work because of her knee injury, or whether Harris requested an on-the-job accommodation. Her entire claim is based on the unsupported hearsay statement that Harris was told that if she did not return back to work, she would be medically separated. (See Pl.'s Dep., at 120.)

Similarly, with respect to Officer Thomas, an officer who allegedly had two knee surgeries, Plaintiff's allegations are based on sheer hearsay, as she has no first-hand knowledge of Thomas's circumstances. (See id. at 123-24.)

20

Plaintiff's allegations with respect to the third correction officer, who allegedly has asthma, are similarly unsupported and, in any event, undermine her claim of disparate treatment. According to Plaintiff, the officer with asthma requested and was denied reassignment to another position. (See id. at 124.) This suggests that officers with knee injuries are not singled out with respect to the denial of job accommodations.

Plaintiff's unsupported allegations are insufficient to establish the existence of an identifiable group of DOC employees with knee injuries or other disabilities, who were discriminated against by being denied job accommodations and compelled to return to full duty work while they were still recovering, under the threat of medical separation. See Patterson v. County of Oneida, N.Y., 375 F.3d 206, 219 (2d Cir. 2004) ("Rule 56(e)'s requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavit also means that an affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial.").

However, even if Plaintiff could establish the existence of an identifiable class of employees with knee injuries or other disabilities who requested medical accommodations, but were forced to return to work without them, Plaintiff cannot show that she is a member of that group. Plaintiff was never denied a medical

accommodation; indeed, she never requested one. DOC policy allows for the possibility of accommodating employees with disabilities. (See Ex. B annexed to Lugo Decl., Directive 2232R, Reasonable Accommodation.) To request a reasonable accommodation, a DOC employee must fill out the "Reasonable Accommodation Form," and must be able to perform the essential functions of his or her position. (See id. at page 7, (V) Step III-IV.) Although aware of the policy (see Pl.'s 56.1 Stmt. ¶ 11), Plaintiff never submitted a request for accommodation in writing or otherwise, as required by DOC policy.[4] (See Wiggins Dep., at 87, 110.)

Plaintiff's claim that she and others were discriminatorily terminated because of knee injuries or other disabilities, fares no better. Plaintiff was medically separated from service pursuant to Civil Service Law § 71, which authorizes public employers to medically separate civil servants if they are out on medical leave for more than one year, and fail to demonstrate that they are fit to return to full duty.[5] That statute applies to all civil

---

[4] Plaintiff claims she spoke to a union delegate about seeking a non-running position, due to her injury. (See Wiggins Dep., at 135.) However, a union delegate is not a DOC employee with authority to provide a workplace accommodation; nor do union delegates play a role in DOC's procedures for securing a disability accommodation. (See Ex. B annexed to Lugo Decl.)

[5] Plaintiff contends that, at one point, while visiting an HMD doctor regarding her injury and pending knee surgery, the doctor told her she was faking her injury and threatened to medically separate her if she did not return to work the next day. (See Wiggins Dep., at 71.) Even if this occurred, Plaintiff was not separated from service for that reason, and the doctor's

22

servants, regardless of the nature of their illness or impairment. One year from the commencement of her sick leave, DOC informed Plaintiff that she would be medically separated and placed on disability retirement on July 15, 2005, unless she was able to return to work in a full duty capacity, and provided medical documentation to that effect. (See Ex. F annexed to Lugo Decl., Letter from Assistant Commissioner Robert O'Leary to Plaintiff, dated June 15, 2005.) In fact, Defendant gave Plaintiff thirty days' notice to come into compliance, even though it was not required to do so.

Plaintiff admits that on July 15, 2005, a full year after she commenced her sick leave, she was still not fit to return to duty because she needed to have knee replacement surgery. (See Pl.'s Rule 56.1 Stmt. ¶ 18.)[6] Thus, in applying the Civil Service Law, DOC had a rational basis for its decision to medically separate

---

seemingly insensitive conduct was directed to Plaintiff as an individual, not as a member of a class. The doctor's statement is insufficient to demonstrate a DOC policy directed at people with knee injuries, and insufficient to give rise to liability on the part of the City of New York.

[6] Plaintiff was advised that an employee can seek reinstatement within one year of being medically separated, if she submits the appropriate documentation from her doctor indicating she is fit to return to full duty. (See Letter from Assistant Commissioner Robert O'Leary to Plaintiff, dated June 15, 2005, Ex. F to Lugo Decl.) See New York Civil Service Law § 71. There is no evidence that she applied for reinstatement.

23

Plaintiff from employment.[7]

Therefore, Plaintiff fails to provide competent evidence demonstrating that other similarly situated DOC employees were treated more favorably than she. Plaintiff offers no evidence of any employees who had injuries or disabilities unrelated to their knees, who were accommodated or given more favorable treatment in comparison to the treatment she received. And, as for non-disabled employees, they are not similarly situated because they are capable

---

[7] Plaintiff does not challenge Civil Service Law § 71 as facially denying her and other medically-unfit employees equal protection. Any such challenge would face insurmountable hurdles, as there is clearly a rational basis for distinguishing employees who are medically unfit to perform the duties of their job from those who are capable of performing their jobs. See Howe v. Perales, 84 N.Y.2d 665, 672, 621 N.Y.S.2d 287 (1994) (denying equal protection challenge to Section 71 of the Civil Service Law, New York Court of Appeals holds: "We conclude that because categorically different treatment of injured civil servants promotes an efficient civil service in a fiscally sound manner, it is rationally related to the State's interest in employing productive civil servants."); Cf. Kimel v. Florida Bd. Of Regents, 528 U.S. 62, 82-83, 120 S. Ct. 631, 646 (2000) (in upholding age-based distinctions, Court observes: "States may discriminate on the basis of age without offending the Fourteenth Amendment if the age classification in question is rationally related to a legitimate state interest. . . . [W]hen conducting rational basis review we will not overturn such [government action] unless the varying treatment of different groups of persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the [government's] actions were irrational.") (internal citations omitted); Gregory v. Ashcroft, 501 U.S. 452, 470-71, 111 S. Ct. 2395, 2406 (1991)(Court upholds retirement age requirement for state court judges) ("In cases where a classification burdens neither a suspect group nor a fundamental interest, courts are quite reluctant to overturn governmental action on the ground that it denies equal protection of the laws.") (internal quotations omitted).

24

of performing their full duties, and it is precisely because of that capability that there is a rational basis for DOC to distinguish between them and employees who are not medically fit to perform their duties after being out on sick leave for one year. Without evidence that Plaintiff was treated differently than other similarly situated employees, she cannot establish that the Equal Protection Clause was violated. Cf. Brown v. City of Oneonta, N.Y., 221 F.3d 329, 337 (2d Cir. 2000) (noting that an equal protection claim based on selective treatment requires that the plaintiff "allege the existence of a similarly situated group that was treated differently").

For all of the above reasons, Defendant is entitled to summary judgment on Plaintiff's equal protection claim.[8]

## II. Pendent State Law Claims

Defendant argues that upon dismissal of Plaintiff's Section 1983 claim, this Court should dismiss Plaintiff's pendent state law disability discrimination claims. If all federal claims in a complaint are dismissed before trial, a court may, in its

---

[8] Because Plaintiff cannot establish an equal protection violation, there is no need to address the issue of municipal liability. The Court notes, however, that there would be no basis to hold the City liable for the alleged random acts of harassment by individual doctors or DOC employees, particularly since there is no allegation that DOC decision-makers were even aware of Plaintiff's complaints. See Dawson v. County of Westchester, 351 F. Supp. 2d 176, 195-96 (S.D.N.Y. 2004) (finding that actions taken by individual defendants, "even if they were found to be discriminatory, were not the result of the County's policy").

25

discretion, decline to exercise supplemental jurisdiction over any remaining state law claims. See 28 U.S.C. § 1367(c); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130, 1139 (1966); Lennon v. Miller, 66 F.3d 416, 426 (2d Cir. 1995); Castellano v. Bd. of Trustees, 937 F.2d 752, 758 (2d Cir. 1991). "'[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.'" Morse v. Univ. of Vt., 973 F.2d 122, 127 (2d Cir. 1992) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7, 108 S. Ct. 614, 619 n.7 (1988)). As the Second Circuit has concluded:

> We think that in the absence of any remaining federal claims, the appropriate analytic framework to be applied to discrimination claims based on a 'disability' as defined by the New York state and municipal law is a question best left to the courts of the State of New York . . . Indeed, we conclude that the state-law claims should be dismissed so that the state courts can, if so called upon, decide for themselves whatever questions of state law this may present.

Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2001).

Exercising its discretion, the Court dismisses Plaintiff's state law claims without prejudice.

## CONCLUSION

For the reasons set forth above, this Court grants Defendant's

26

motion for summary judgment and dismisses this action with prejudice. The Clerk of Court shall enter judgment for Defendants.

So Ordered.

_____
THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: August 12, 2008
       New York, New York

Copies mailed to:

Carolyn Walker-Diallo, Esq.
Assistant Corporation Counsel
100 Church Street - Room 2-140
New York, New York 10007-2601

Thomas Ricotta, Esq.
Leeds Morelli & Brown, P.C.
One Old Country Road - Suite 347
Carle Place, New York 11514